## AFFIDAVIT

I, Nathan Enriquez, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—a cellular device further described in Attachment A—which is currently in law enforcement possession, and the extraction from that property of electronically stored information as described in Attachment B.

2.      I am a criminal investigator and law enforcement agent of the United States within the meaning of 18 U.S.C. § 2510(7), who is empowered by federal law to conduct investigations and make arrests for offenses enumerated in Titles 8, 18, 19, 21, and 31 of the United States Code.  My Title 21 cross designation date is February 27, 2021.

3.      I have been employed as a Homeland Security Investigations (HSI) Criminal Investigator since January 2020. I have completed multiple federal law enforcement academies, including the Criminal Investigator Training Program ("CITP") and the HSI Special Agent Training Program ("HSISAT") at the Federal Law Enforcement Training Center in Glynco, Georgia.  During CITP and HSISAT, I received training regarding investigative techniques relating to violations of federal laws, including the application and execution of search and arrest warrants.

4.      I am assigned currently to the Border Enforcement Security Taskforce (BEST) in Sells, AZ.  As a Special Agent, I have been trained and participated in criminal investigations, including, but not limited to, those relating to narcotics smuggling, human smuggling, firearms smuggling, bulk cash smuggling, kidnapping, assault, conspiracy, and gangs.  I have been trained in the execution of federal search warrants. Additionally, I have participated in Transnational

Criminal Organizations ("TCO") operations to include surveillance and system research applications.

5.     Prior to becoming a Special Agent, I was a United States Customs and Border Protection Officer (CBPO) from June 2012 to December 2019 at the Lukeville Port of Entry in Arizona.  As a CBPO, I was responsible for enforcing Customs and Immigration laws while targeting high risk travelers and conveyances entering and leaving the United States. I have received advanced training in Human smuggling throughout my career as a CBPO and Special Agent.

6.     Based on my background, training, and experience, I know that individuals who are involved in Human smuggling often do the following:

a.  Use cellular telephones and laptops to arrange, coordinate, and monitor criminal activities including communicating with smugglers, arrangers, and other transporters/drivers. They also use these devices to communicate with these same individuals during counter-surveillance activities to warn other co-conspirators of the presence of law enforcement or other obstacles to their criminal plans.

b.  Use of cellular devices and electronic communications is critical in organizing the pickup and transportation of illegal aliens. In many cases, illegal aliens will cross the southern border and travel covertly to remote locations to be picked up by a smuggler or their cohort. Without such communications the aliens nor the driver would know the location of pickup and drop-off points.

c.  Use cellular telephones and laptops to contact financial institutions where they launder their proceeds or receive payment for their roles in illicit schemes.

d.  Use the same devices to contact individuals who sell/rent real estate, vehicles, hotel rooms, restaurants, or other facilities smugglers use in the course of their illegal activities.

e.  Use all the communication technologies available within cellular telephones and laptops to accomplish their criminal activities, including voice messaging, texting, audio communication, direct dial, push-to-talk, emailing, internet access, speed-dial, photo and video images, and contact lists containing contact information for their criminal associates.

f.  In turn, human smugglers will order confederates of the organization to destroy records, cancel cellular telephone service, and delete computer files associated with the criminal enterprise.  Your affiant knows that in dynamic and evolving situations, it is imperative to eliminate the chance of the destruction of property. Subjects involved in human smuggling activity can quickly destroy records associated with their criminal activity, including electronic data and computer files.

7.  This affidavit is provided in support of an application for a search warrant which would authorize the forensic examination of the aforementioned cellular telephone particularly described in Attachment A for the purpose of identifying electronically stored data particularly described in Attachment B.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

8.  The property to be searched:

3

a. A black LG phone belonging to Sunshine BETTERS (hereafter referred to as **Target Device #1** or **TD#1**). The device is currently located at the HSI Sells office.

9.     The applied-for warrant would authorize the forensic examination of this device for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

10.     On July 25, 2021, at approximately 2040 hours, a black Chevrolet Tahoe, bearing Arizona license plate CJN8152, approached the United States Border Patrol Immigration checkpoint at mile marker 146 on State Route (SR) 86 near Three Points, Arizona. Border Patrol Agent (BPA) Edgar Albornoz was the primary agent conducting inspections of the occupants of the vehicle. BPA Alexander Weber was the secondary officer assisting in a visual inspection of the vehicle. BPA Weber noticed what appeared to be hair on the top of a person's head, sticking out from underneath a blanket in the cargo area of the Tahoe. BPA Weber advised BPA Albornoz to ask for permission to search the cargo area of the vehicle. BPA Albornoz asked for consent to search the vehicle and was denied by the driver. The driver of the vehicle was later determined to be Sunshine BETTERS (COC: United States Citizen, DOB: 08/10/1976). BPA Weber walked to the driver's side window and asked the driver for consent to search the vehicle. The driver denied the request saying she did not understand why he needed to search the vehicle and that she just wanted to get home. BPA Weber explained to BETTERS that he believed there were more people in the vehicle than being reported and referred BETTERS and the vehicle to secondary inspection area.

11. In the secondary inspection area, BETTERS was advised to turn off the engine and exit the vehicle. As BETTERS was exiting the vehicle, BPA Weber again asked for permission

4

to search the vehicle. BETTERS again denied the request saying that she did not understand why agents needed to search the vehicle since nobody else was in it. BPA Weber explained to BETTERS that he is a certified canine handler and was going to perform a free air sniff on the exterior of the vehicle. BPA Albornoz escorted BETTERS to the secondary inspection seating area and provided oversight as BPA Weber retrieved canine Shadow from the canine vehicle.

12. BPA Weber deployed canine Shadow and conducted a free air sniff of the exterior of the vehicle. Canine Shadow alerted to a trained odor near the seam of the rear driver's side door by wagging his tail, closing his mouth and sniffing intensely through his nose along the seam of the door. Shadow began tracing the odor to its strongest source and traced the odor to the rear cargo door, where he immediately indicated by sitting near the driver's side taillight. BPAs opened the rear cargo door and noticed laundry baskets full of clothes on top of a black blanket. Once the laundry baskets were removed from the vehicle, BPA Weber moved the blanket and found four male subjects underneath the blanket without seatbelts. At 2051hours, BPA Albornoz placed BETTERS under arrest for alien smuggling (8 USC 1324).

13. During a subsequent search of the vehicle, BPAs found a half drank 24 oz can of Budweiser in the cup holder. When asked how much BETTERS had to drink that night, BETTERS admitted to "only drinking that can." A baggy of a green leafy substance was in the passenger backseat seat pocket. The substance was later tested and tested positive for the properties of Marijuana and weighed a total of 4.9 grams. All subjects were transported to the Tucson Coordination Center (TCC) for processing.

14. On July 26, 2021, at the Tucson Border Patrol Station in Tucson Arizona, U.S. Border Patrol Agents Daniel Simental and Edgar Albornoz interviewed all four subjects as to their role and involvement while being smuggled into the United States illegally. All four subjects stated that they were citizens and nationals of Guatemala without legal documents to reside, enter, or remain in the United States legally.

15. The subjects stated that they made their smuggling arrangements in Guatemala. Subjects stated that they crossed illegally into the U.S. on July 20, 2021, near San Miguel, AZ. The subjects stated that they were instructed to walk to an unknown location where a grey SUV was going to be waiting for them. The subjects stated that a male driver matching the description of the vehicle that they were given, picked them up and took them to a house on July 25, 2021. The subjects stated they stayed in the house for about four hours. The subjects stated that a female, later identified as BETTERS, Sunshine Michelle, driving a black SUV arrived at the house that they were staying in. The subjects stated that one of them got in the front passenger seat and the three other subjects got in the back seat. The subjects stated that they were driving east on HWY 86, when the driver suddenly stopped on the side of the highway. She told everybody to get in the back portion of the SUV. The subjects stated that they were later arrested at the U.S. Border Patrol Checkpoint. The subjects described the driver as being a female with short hair, short in stature, and was heavy set.

16. BPAs conducted record checks on BETTERS that revealed an outstanding arrest warrant entered by Homeland Security Investigations (HSI) Sells for 8 USC 1324 (Alien Smuggling). Agents notified your Affiant regarding the apprehension of

BETTERS. Your Affiant and SA Rudy Rodriguez responded to TCC and transported BETTERS to Core Civic America (CCA) in Florence, AZ. BETTERS had an arrest warrant for a human smuggling incident that occurred on June 3, 2021. BETTERS was the driver of a vehicle that was involved in a vehicular accident resulting in the death of one of the two undocumented aliens she was transporting. Due to BETTERS injuries in that accident, BETTERS was not immediately taken into custody as she was receiving treatment. On June 30, 2021, in the United States District Court for the District of Arizona, located in Tucson, Arizona, a Federal Grand Jury returned a three (3) count indictment against Sunshine Michelle BETTERS.

17. Your affiant investigated the June 3, 2021 alien smuggling event involving BETTERS. In that case the aliens that had been in her vehicle were directed to a meet point via cell phone communications. Based upon this your Affiant secured a federal search warrant for BETTERS' cellular device. Analysis of that device revealed evidence indicative of alien smuggling, including communications that the two aliens were ready for pickup. This analysis leads your Affiant to believe that BETTERS will employ cellular devices to communicate with coconspirators when planning and executing alien smuggling.

18. Tucson Border Patrol Agents turned over **TD#1** to your Affiant stating it was the cellular device BETTERS had in her possession during the apprehension. **TD#1** had received several text messages and missed phone calls. **TD#1** had a total of 26 missed calls and 12 text messages since the time of the incident.

19. Based on my training and experience, I know facilitators of human smuggling will frequently contact their human smugglers and co-conspirators. Additionally, I know the vast majority of the humans smuggled into the United States through the desert in Sells, Arizona, prior to being transported throughout the United States. The most direct and commonly used route to Tucson from Sells, Arizona, is eastbound on State Route 86 (SR-86). Smugglers will have to pass through United States Border Patrol checkpoints located near Three Points Arizona. I know that suppliers and facilitators want real time updates from the smugglers as they pass through each of these checkpoints. Therefore, I believe the high volume of missed calls and text messages on **TD#1** are indicative of Human smuggling behavior.

20. Based on the above findings and my experience and training, I believe the items described in Attachment A, now in the custody of HSI, contain evidence of human smuggling and will assist law enforcement in identifying additional members of this criminal organization.

## **TECHNICAL TERMS**

21. Based on my training and experience, I use the following technical terms to convey the following meanings:

    a.  Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of

8

calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can

9

mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

    c.   Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

22. Based on my training and experience, I know that devices like the ones described in Attachment A have capabilities that allow them to serve as a wireless telephone, digital camera, and GPS navigation device. In my training and experience, the nature of human smuggling necessitates frequent and immediate communication between co-conspirators and accomplices. As such, examining data stored on devices of this type frequently uncover, among other things, evidence that reveals who possessed or used the device; the rank and scope of their participation in the smuggling organization; who their accomplices were; as well as revealing or validating particular details regarding the instant criminal conduct.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

23. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

24. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(2)(B), the warrant I am applying for would permit HSI, or their designee, examination of the

above listed device and/or associated peripheral equipment, including by way of example but not limitation, subscriber identity module (SIM) card(s), removable storage media, and or paired/synced device(s) for the evidence listed in the affidavit and warrant using a range of data analysis techniques.

25. *Manner of execution.*   Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve physical intrusion onto a premise. Therefore, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

26. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the devices described in Attachment A to seek the items described in Attachment B.

Respectfully submitted this 20th day of August 2021.

NATHAN J ENRIQUEZ                Digitally signed by NATHAN J ENRIQUEZ
                                 Date: 2021.08.20 10:50:36 -07'00'

Nathan Enriquez
Special Agent, HSI

Subscribed and sworn to telephonically on August 20, 2021:

UNITED STATES MAGISTRATE JUDGE

11

<u>ATTACHMENT A</u>

a.  A black LG phone, IMEI 352082509149599, belonging to Sunshine BETTERS. The
    device is currently located at the HSI Sells office **(TD#1).**




ATTACHMENT B

1.      All records on the Devices described in Attachment A that relate to violations of 8 USC § 1324, including:

a.  Any contact made either by call, text message, email, or third-party application initiated with, or received by, this device;

b.  Types and prices of smuggling activities as well as dates, places, and amounts of specific transactions;

c.  Any corroborating information recording any schedules or travel itineraries;

d.  All bank records, checks, credit card bills, cash payments, account information, and other financial records memorialized on the device.

e.  Evidence of user attribution showing who used or owned the device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

2.      As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) or photographic or document form.

2